**HEYL & PATTERSON, INCORPORAT-ED, Appellant and Cross-Appellee,**

v.

**McDOWELL COMPANY, Incorporated, and Norfolk and Western Railway Company, Appellees and Cross-Appellants.**

**No. 8654.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 10, 1962.

Decided May 14, 1963.

Aubrey R. Bowles, Jr., Richmond, Va. (Bowles, Boyd & Herod, Richmond, Va., Edward Hoopes III, and Blenko, Hoopes, Leonard & Buell, Pittsburgh, Pa., on brief), for appellant and cross-appellee.

Justin W. Macklin and John F. Pearne, Cleveland, Ohio (Fielding L. Williams, and Williams, Mullen & Christian, Richmond, Va., on brief), for appellees and cross-appellants.

Before SOPER, BOREMAN, and J. SPENCER BELL, Circuit Judges.

J. SPENCER BELL, Circuit Judge.

The instant action involves a claim of patent infringement; the defenses raised are non-infringement and invalidity of the patent. A cross claim for a declaratory judgment of the patent's invalidity is asserted.

The handling of frangible bulk material, in the instant action the delivery of coal from shoreside to a ship's hold, has proved difficult where it was necessary to prevent breakage. For certain uses, it is helpful for coal lumps to be of a specific and uniform size. Coal of this type is known as "prepared coal" and is more valuable for certain commercial purposes than unprepared coal. Any substantial free fall of such coal may cause "degradation", or breakage into smaller lumps and a correlative decrease in commercial value. Both the apparatus of the patent in suit and the accused apparatus attempt to minimize degradation while the bulk material is being loaded into a ship's hold.

The plaintiff, Heyl & Patterson, Incorporated, is assignee of United States Patent No. 2,651,423 for an "Apparatus for Loading Bulk Material into a Ship's Hold", a combination patent issued September 8, 1953, after application made on February 2, 1951.

The general scheme of plaintiff's patent [1] is as follows: a variable speed conveyor belt delivers the coal (or other bulk material) from a point on shore to an elevated point on a structure by the pier; the coal drops off the conveyor belt and falls into a pan that is trapezoidal in shape, being substantially wider at the top than at the bottom. The pan, swingably mounted on the structure, feeds directly into a chute that can be lowered into the ship's hold. At the bottom of

1. "We claim:
 "1. Apparatus for loading bulk material into a ship's hold or the like comprising a supporting structure, generally upright hollow delivery means through which bulk material being loaded passes downwardly, the delivery means having an open upper end, the delivery means being swingably supported by the supporting structure with it open upper end disposed below the top of the supporting structure, the delivery means having a discharge opening at its lower end, an adjustable control gate for the discharge opening controlling the rate of passage of bulk material out of the bottom of the delivery means, a conveyor for conveying bulk material into the open upper end of the delivery means, a variable speed drive for the conveyor, the portion of the delivery means at and for a substantial distance downwardly from the open upper end thereof being of relatively very great transverse cross-section as compared with the maximum transverse cross-section of the discharge opening and tapering to smaller cross-section toward the discharge opening so that bulk material filling the delivery means moves downwardly very slowly at the transversely enlarged upper portion thereof as compared with the rate of passage of the bulk material out of the bottom of the delivery means, an operating station on the supporting structure positioned to afford an operator at the station an unobstructed view down into the transversely enlarged open upper end of the delivery means and control means for the variable speed conveyor drive, the control means being disposed at the operating station enabling the operator while watching the relatively very slow downward movement of the bulk material at the transversely enlarged upper portion of the delivery means to operate the control means to control the speed of the conveyor and thereby maintain approximately constant the level of bulk material in the delivery means and avoid degradation of the bulk material which might occur due to its falling freely."

 2. Claim two is similar to claim one except that it refers to a plurality of conveyors in series for conveying bulk material from a source into the open upper end of the delivery means.

 3. Claim three is similar to claim one except that it refers to hopper means for delivering bulk material to the conveyor means.

the chute is a gate which can be used to block the flow through the chute. When prepared coal is being loaded, the gate is so adjusted as to allow coal to fill the chute and back up into the trapezoidal pan. The gate is then opened so that the coal can flow into the ship's hold. The speed of the conveyor belt is manually varied by the operator so that the trapezoidal pan is never permitted to empty. The result is that a solid column of coal is maintained in the chute which prevents the breakage that would occur if the coal were permitted a free fall down the entire length of the chute. The free fall of the coal is limited to the distance from the tip of the conveyor belt to the top of the pile of coal in the trapezoidal pan. The trapezoidal pan acts as a funnel since its upper cross-section measurements are greatly in excess of the cross-section measurements of the chute, and so the rise and fall of the level of coal in the pan is slow enough for the operator to react in time to maintain a solid column of coal by appropriately varying the speed of delivery of coal by the conveyor belt. The operator is placed so that he can see into the upper end of the trapezoidal pan, and he is provided with controls for regulating the flow of coal.

The District Court found the plaintiff's patent valid but not infringed. The instant cross-appeals were then filed.

A brief look at the prior art is appropriate at this point. The use of a solid column of coal in a telescopic chute to prevent degradation is old and well known. Lindsley (Patent No. 544,103), issued in 1895, discloses an apparatus to be used to maintain a solid column of coal in a telescopic chute, containing two trapezoidal pans to act as funnels arranged in sequence above the telescopic chute. Maintaining a solid level of coal in the chute is also disclosed in MacLennon (Patent No. 1,331,020), granted in 1920; Weigert (Patent No. 1,852,385), granted in 1932; and in Kaltenbach (Patent No. 1,876,685), granted in 1932.

Many "high lift" or "high trestle" loaders, in which coal cars were lifted by elevator or run over track to an elevated point on the loader and then dumped into pans or bins which fed into a chute were in operation long before plaintiff applied for its patent. Among these was defendant's old loader at Seawell's Point, constructed by plaintiff about 1939. When prepared coal was being loaded, the chute was kept full, as in the patent in suit.

The use of a gate at the bottom of the chute was also well known in the art, Kaltenbach (Patent No. 1,876,685), granted in 1932.

The use of a conveyor belt in connection with a coal loading structure was disclosed in Stuart (Patent No. 1,241,-053), granted in 1917; Scott (Patent No. 1,325,704), granted in 1919; Weigert (Patent No. 1,852,385), granted in 1932; Nelson (Patent No. 2,430,407), granted November 4, 1947; and in the British magazine Railway Gazette in a series beginning on January 7, 1944, entitled "Cargo Coaling Plants". Stuart specifically provides for a variable speed conveyor belt. Provided in several patents is a cab located so the operator may observe the level of the coal in the apparatus.

Many of the structures in the prior art, particularly the high lift or high trestle loader, were arranged to allow the operator to vary the rate of delivery of coal, for example, controlling the tilt of the coal cars while spilling the coal into the pan. The operator could and did control the flow so as to maintain an even level of coal in the chute or pan. In the Weigert patent, an automatic shut off is provided in the upper pan to stop the delivery of coal when the level rises too high in the pan, and to restart delivery when the level falls. An unpatented installation at Howland Hook, Staten Island, is generally similar to plaintiff's patent except that the conveyor belt has only two forward speeds instead of a continuum of forward speeds, and the pan is not as greatly enlarged as plaintiff's patent suggests.

Of course, the general idea of dumping coal from a large container into a nar-

row chute so as to be able to maintain a solid column of coal in the apparatus is basic to many of these patents. This had been done by using the coal cars themselves as the large container, or by using a bin or pan into which the coal is dumped as a container.

In summary, the prior art discloses variable speed conveyor belts to lift the coal from the shore to the loader structure, wide funnel-like pans to accept the coal as delivered to the loader, also chutes, gates, and the idea of preventing degradation of prepared coal by keeping the loading chute filled with a solid column of coal.

Plaintiff's patent combines the above elements into one apparatus, using the trapezoidal pan to aid the operator in manually varying the flow from the conveyor to maintain a solid column of coal, freeing, to some extent, the gate for use to allow coal to flow out at a more rapid rate. It is conceded that all of the elements of the patent are old, the claimed inventiveness being in the combination.

■ Although it is quite true that an apparatus which is a mere combination of elements known in the prior art may be patentable, Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177 (1881), and it is also true that the mere fact that each element does, in one sense, what it always has done (e. g., conductors conduct, insulators insulate) does not necessarily negative patentability, Entron of Maryland v. Jerrold Electronics Corp., 295 F.2d 670 (4 Cir. 1961), nevertheless, a combination patent cannot be sustained where it is shown that it lacks inventiveness, Great A & P Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). In the language of the statute, 35 U.S.C.A. § 103, "A patent may not be obtained though the invention is not identically disclosed * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art * * *."

■ In a combination patent, unless the improved elements coact in a new way with the elements of the patent disclosed in the prior art, the claims may not be allowed. Application of Hall, 208 F.2d 370, 41 CCPA 759 (C.C.P.A.1953). It is usually difficult to find true inventiveness in a combination patent, Great A & P Tea Co. v. Supermarket Equipment Corp., supra; Kay Patents Corp. v. Martin Supply Co., 202 F.2d 47 (4 Cir. 1953).

■ The standard of patentability is a constitutionally required one, Great A & P Tea Co. v. Supermarket Equipment Corp., supra 340 U.S. at 154, 71 S.Ct. at 131 (concurring opinion), and the question of the validity of a patent is a question of law, Mahn v. Harwood, 112 U.S. 354, 358, 5 S.Ct. 174, 28 L.Ed. 665 (1884). The statute, 35 U.S.C.A. § 282, provides that "a patent shall be presumed valid" and "the burden of establishing invalidity of a patent rests on the party asserting it". Of course, this presumption is rebutted when there is a showing of lack of invention, 35 U.S.C.A. §§ 103, 282(2). The presumption of validity can be weakened or destroyed where there has been a failure to cite prior art before the patent examiner, L. S. Donaldson Co. v. La Maur, Inc., 299 F.2d 412 (8 Cir. 1962), Cert. Denied 371 U.S. 815, 83 S.Ct. 27, 9 L.Ed.2d 57 (1962); B. F. Goodrich Co. v. U. S. Rubber Co., 244 F.2d 468 (4 Cir. 1957). In the instant case some relevant prior art was not cited before the examiner, e. g., Stuart's variable speed conveyor belt, supra, the series of articles entitled "Cargo Coaling Plants" in the British magazine Railway Gazette, and the Howland Hook installation. The statutory presumption is at least weakened by the failure to cite this prior art. We have come to the conclusion that the instant patent, the statutory presumption of its validity thus weakened by failure to cite the relevant prior art, has not withstood the force of the defendant's attack.

As we have indicated, the prior art included variable speed conveyor belts, a chute kept full of coal to prevent degrada-

tion, an adjustable gate on the bottom of the chute, and the idea of varying the speed of delivery of the coal to the chute and controlling the rate of flow from the chute to aid in maintaining a high level of coal in the chute. The prior art also disclosed the use of a pan substantially enlarged at the top and tapering to a relatively narrow point placed above the chute and the use of a cab so placed as to allow the operator a view of the delivery means, chute, and ship's hold.

 The plaintiff abandoned before the patent examiner his claim to a new method of using the old apparatus. Certainly such a claim was not tenable in the face of the evidence with respect to the operation of the Howland Hook installation, which was from time to time used in precisely the same manner as the plaintiff's apparatus to load prepared coal. While the degree of control over the level of coal in the relatively small surge pan at the top of the chute at Howland Hook resulted in less accuracy, there can be no doubt that the method of its use was the same as plaintiff's. Furthermore, we are convinced that, Howland Hook aside, there was not sufficient inventiveness in plaintiff's device to make it patentable over the prior art. The function of the enlarged open upper end as a surge bin to maintain force on the standing column of coal was evident in the prior art, and its maintenance of level function is clearly taught by Adams (Patent No. 1,752,410) and practiced with numerous devices used in connection with "high lift" or "high trestle" loaders. In practical effect, the plaintiff has taken the fixed surge bin and made it a part of the movable chute. We think that both Adams and Weigert anticipated this, and Howland Hook, to a lesser degree than plaintiff, put it into practice. Such a change in degree over the prior art does not constitute inventiveness. Todd v. Sears, Roebuck & Co., 216 F.2d 594, 597 (4 Cir. 1954).

Nor is there any substantial evidence of commercial success to buttress plaintiff's claim of inventiveness. It was conceded that choice between the high lift or high trestle device on the one hand and the belt conveyor systems on the other lay mainly in the surrounding conditions, and not in the respective costs of installation per se. The advantages of conveyors arise where easy railroad access to dockside is not available and conveyor belts have long been in use to overcome this difficulty.

 The patent is also invalid for claiming too much. The mere improvement of one portion of an apparatus does not permit a patenting of the whole. Lincoln Engineering Co. v. Stewart Warner, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008 (1938); Bassick Mfg. Co. v. Hollingshead, 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251 (1936); Application of Hall, 208 F.2d 370, 41 CCPA 759 (C.C.P.A. 1953); McGrath Holding Corp. v. Anzell, 58 F.2d 205 (2 Cir. 1932). Plaintiff, having at the very most hit upon a mechanical change to facilitate the use of the upper end of the chute leading to the ship's hold in place of a stationary pan, patented the entire apparatus from the hopper to the gate. This is much more than any possible invention to be found in plaintiff's apparatus.

We therefore, hold that the plaintiff's patent is invalid in that it is lacking in invention and because it claims too much. The findings of the Patent Office and the District Court to the contrary are clearly erroneous. Because of this holding it is not necessary to give consideration to the issue of infringement. The judgment of the District Court is, therefore,

Affirmed in part and reversed in part.

NOTE: Judge SOPER became critically ill before the opinion was prepared and was unable to give it his attention, although he had expressed to the other members of the panel his conclusion of invalidity.