**GRINNELL CORPORATION, Plaintiff,**

v.

**VIRGINIA ELECTRIC & POWER COMPANY, Stone & Webster Engineering Corporation, Bergen Pipesupport Corporation, Bergen-Paterson Pipesupport Corporation, Bergen Iron and Engineering Co., Inc., Defendants.**

**Civ. A. No. 4193.**

United States District Court
E. D. Virginia,
Richmond Division.

Oct. 23, 1967.

Richard H. Catlett, Jr., Richmond, Va., Dike, Thompson, Bronstein & Mrose, Boston, Mass., David D. McKenney, Providence, R. I., for plaintiff.

Lewis T. Booker, Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., Harry R. Pugh, Jr., David W. Plant, Fish, Richardson & Neave, New York City, for Virginia Electric & Power Co. and Stone & Webster Engineering Corporation.

John B. Street, Jr., Stoneman & Chandler, Boston, Mass., Francis J. Pisarra, Henderson & Pisarra, New York City, for Bergen Pipesupport and Bergen-Paterson Pipesupport Corporations.

## MEMORANDUM OF THE COURT

BUTZNER, District Judge.

This action is for the alleged infringement of three of Grinnell's United States patents:

Loepsinger Patent No. 3,115,886 issued from an application filed December 5, 1960, which was a continuation-in-part of patent application filed January 26, 1959, which in turn was a continuation-in-part of patent application filed February 3, 1958.

Sherburne Patent No. 3,115,753 was issued from an application filed December 8, 1960 which was a continuation of patent application filed March 31, 1958.

Sherburne Patent No. 3,116,045 issued from a patent application, filed December 8, 1960.

All the patents in suit issued on the same day.

The patents provide method and means for automatically controlling the position of high temperature piping and related equipment in steam power plants.

The issues are directed to the validity and infringement of each of the patents. The answer includes a counterclaim for declaratory relief. Neither jurisdiction nor venue is disputed.

The plaintiff Grinnell and the defendant Bergen Pipesupport · Corporation have been for about the past ten years the principal manufacturers and suppliers to the power plant industry of a full line of pipe supports. Bergen Iron is a predecessor of Bergen Pipesupport; Bergen-Paterson is a successor to Bergen Pipesupport.

The assignments of the patents to Grinnell by Loepsinger and Sherburne, its employees, are not disputed.

The accused devices were designed and installed by Bergen in Virginia Electric & Power Company's (VEPCO's) Chesterfield Station No. 5 at Chester, Virginia. Stone & Webster Engineering Corporation designed and erected this station and called for the accused devices in its specifications.

The court concludes that the patents are invalid.

I. *High Temperature Piping in Steam Power Plants*

1. Steam power plants include a boiler, a turbine and one or more pipelines to conduct steam from the boiler to the turbine. Main steam lines conduct steam to the high pressure section of the turbine. The steam exhausted from this · section is often led back to the boiler, reheated and again conducted from the boiler to a lower pressure section of the turbine through one or more hot reheat lines.

2. During the starting up and the shutting down of a generating unit the temperature of the main steam lines and hot reheat lines may change by as much as 900° F. or 1,000° F. These lines are generally composed of steel which changes in length as its temperature changes. For example, a typical steel pipeline 100 feet in length will expand about 9 inches in length as its temperature increases from room temperature to 1,000° F.

3. If the normal thermally-induced expansion of a length of steel piping is constrained by connected equipment or rigid restraints, a compressive force is created in the pipe. This force condition, known as "stress," is usually described in terms of pounds per square inch of cross-sectional area of the pipe. When the steel pipe is constrained against movement as its temperature is increased, a compressive stress of approximately 200 pounds per square inch is created for each degree Fahrenheit increase in temperature.

4. To avoid excessive stresses and forces the piping is run with right-angle bends, offsets and loops between its terminal connections. These bends, offsets and loops increase the length of the pipe, allow some of the thermal expansion of the piping to be absorbed in bending and twisting of the piping itself, and reduce the forces exerted upon the terminal connections.

5. It is extremely important that the pipe, as installed, move substantially as calculated. A number of factors may prevent this. Over-support or under-support of the pipe may result from friction in the hangers, inertia of the piping, lack of uniformity in pipe weight, friction in seals and guides, improper fabrication or installation and shifting of weight during changes of temperature. Limitations imposed by building structures also cause difficulties. Despite these problems the pipe must be designed within the maximum stresses that can be tolerated by the connections to the boilers and generators. Increasing the length of the pipe to control stresses is not always feasible. The pipe costs about $1,000 per foot. Also, the accompanying increased building capacity that would be necessary is expensive. At the VEPCO Chesterfield Station No. 5 a costly redesign of the plant to increase the length of the pipe would have been required if the accused

devices had not been used because the designer was concerned that the pipe might not move as calculated.

6. Rigid supports, anchors, restraints, variable support springs, and constant support springs are used to support and position high temperature piping.

Rigid supports and anchors hold the pipe firmly at the point of their attachment and prevent movement of the pipe at that point in one or more directions. As piping tends to expand or to contract as its temperature changes, the force exerted on the pipe by a rigid support or anchor changes accordingly. As the pipe tends to move toward the rigid support, the rigid support pushes against the pipe; and as the pipe tends to move away from the rigid support, the rigid support pulls on the pipe. Rigid supports are suitable for use where only a small movement of piping is anticipated. Anchors are used to establish points of no movement in a piping system.

Restraints (stationary projections or stops), when contacted by a pipe moving toward them, prevent further movement of the pipe in that direction.

Variable support springs, at the point of their attachment, permit the pipe to move as the pipe expands or contracts with changes in temperature. The variable supports exert a varying force on the piping in accordance with the change in position of the piping. As the pipe moves toward or away from the variable supports, the length of the spring changes and the force exerted by the support on the piping varies accordingly.

Constant supports permit the pipe to move as it changes position with a change in its thermal condition. But unlike variable supports, constant supports, because of their utilization of a lever arrangement, exert a constant force on the pipe as it moves in accordance with changes in its thermal condition. Motor-operated jacks have been used to support piping since the early 1940's.

All of these devices are widely used in the industry.

## II. *The Patents in Suit*

7. Each patent is a servomechanism combining a motorized jack and a control that responds to changes in temperature of the piping to operate the jack, thereby causing the pipe to move to its proper position for each temperature within the temperature cycle, regardless of where the pipe would move in response to temperature changes without the jack. This insures that the stresses at the end connections are kept within allowable limits. The control is activated either directly by the change in temperature, as in Loepsinger '886, or by the position of the pipe resulting from the change in temperature, as in Sherburne '753 and '045.

8. Loepsinger '886 was issued with 29 claims. Grinnell asserts that 20 claims (1–10, 13, 14, 16, 17, 20, 21, 23, 25, 27 and 28) are infringed. The patent relates to the control of pipe position by means of a motor-operated screw jack, which responds to a change in temperature of the pipe. Three temperature sensing devices are shown. The first is a conventional fluid pressure tube. As the temperature in the piping changes, the fluid reflects the change by asserting pressure on an electrical diaphragm, which causes a contact arm of an electrical switch to activate a motor-operated screw jack. The jack asserts a corrective positioning force on an appropriate part of the piping. The switch follows the movement of the jack and as the jack forces the piping to the proper position, the switch breaks contact and the jack no longer moves the piping. The jack becomes a rigid support when it is not operating. Both of the other temperature sensing devices utilize conventional electrical Wheatstone bridge circuits to detect a change in the temperature of a portion of the piping and to follow the corrective action taken by the jack.

9. The structural elements of the combination and the relation of the elements described and claimed in Loepsinger '886 were old in 1956.

Extracts from representative claims of Loepsinger '886 are:

### "CLAIM 1

"Apparatus for controlling the position of at least a portion of fluid handling equipment subject to a change in position due to a change in a thermal condition of said equipment, said apparatus comprising

"means adapted to be operably connected to said portion and responsive to said change in thermal condition for applying to said portion external force to control movement of said portion to a desired position, irrespective of the position change said portion would have had due to said thermal condition change without the application of said external force,

"energy valve means operably connected to said force applying means and adapted to be operably connected to a source of energy to control operation of said force applying means,

"and means operably connected to said energy valve means and responsive to said change in thermal condition to control said energy valve means,

"said last mentioned means correlating said desired position of said portion with said changed thermal condition.

### "CLAIM 5

"A device for controlling the position of at least a portion of high temperature piping comprising

"a first member having anchoring means,

"a second member having pipe attaching means and movable with respect to said first member to change the length of said device between said anchoring means and piping attaching means,

"means for driving one of said members with respect to the other to change the length of the device,

"energy valve means operably connected to said driving means,

"and control means operably connected to said energy valve means and re-

sponsive to a temperature change for controlling said energy valve means,

"said control means including an element movable in response to said temperature change independently of changes in said length to control said energy valve means to actuate said driving means,

"means responsive to relative movement between said first and second members to deactuate said driving means

"said last mentioned means and said movable element correlating said length with temperature.

### "CLAIM 8

"(Apparatus according to claim 1,)

"said portion of said equipment comprising a portion of a piping system and

"in which said change in thermal condition comprises a change in temperature of said system.

### "CLAIM 13

"(Apparatus according to claim 8,)

"in which said system connects by at least one connection units which resist free thermal movement of said system,

"said desired position approximating the calculated position of said portion at said changed temperature

"to thereby prevent said portion from moving to a position at said changed temperature different from that calculated due to any uncalculated expansion and contraction caused by non-uniformities in said system.

### "CLAIM 16

"(An apparatus in accordance with claim 8,)

"in which said force applying means comprises a motor driven jack

(a) having a first portion adapted to be secured to fixed structure

(b) and having a second portion which is movable with respect to said first portion to adjust the length of the jack and which is

adapted to be connected to said system.

## "CLAIM 17

"(Apparatus in accordance with claim 8,)

"in which said energy valve means comprises an electric switch actuated by said changes in temperature,

"in which said force applying means comprises a motor driven jack having an electric motor which is connected to said switch and which is turned on by said actuation of said switch,

"a member associated with said jack and moved by operation of said motor,

(a) said member deactuating said switch to turn off said motor after a predetermined amount of said member movement.

## "CLAIM 27

"(A device according to claim 5,)

"(a) said first and second members comprising a motor driven jack, said driving means comprising an electric motor for driving said jack,

"(b) said energy valve means comprising an electric switch for controlling said motor.

## "CLAIM 28

"(A device according to claim 27)

"said movable element being movable over a range of positions in response to changes in temperature over a range of temperatures, each position within said range of positions corresponding to a temperature within said range of temperatures,

"said driving means being responsive to said movement of said movable element to control said energy valve means to change said length over a range of lengths, each length within said range of lengths corresponding to a position of said movable element whereby said length is correlated with temperature."

10. Sherburne '753 is an improvement patent over Loepsinger '886. In Sherburne '753 the jack is controlled by a sensing device, which responds to any deviation of a piping section from its proper position. Sherburne '753 corrects deviations of the pipe caused by temperature changes and by other means, for example, shock, blowing of a safety valve, distortion of the building, or the jack components.

11. Sherburne '753 issued with 18 claims. Grinnell asserts that 9 claims (9–13, 15–18) are infringed. Sherburne '753 illustrates five forms of position sensing devices. Each of these senses a deviation in angular orientation from a reference position of a part of the piping system and directs a motor-operated force to take corrective action.

The first form utilizes two cables connected to the piping system. A change in orientation of the piping to which the cables are attached is transmitted to a differential gear arrangement through a cable-pulley drum arrangement. If the deviation in angular position of the piping exceeds a predetermined magnitude in one direction or the other, the differential gear arrangement causes an arm to contact either one of two terminals of an electrical switch, which activates a motor-operated unit to apply a corrective force to the piping. The differential gear arrangement follows the corrective change in the piping position, and when the proper position is reached the switch is opened deactivating the motor.

The second form of the position sensing device is similar to the first form except that rods and gears are used in place of cables and pulleys.

Sherburne's third form utilizes a segmented gear, which turns in accordance with a change in angular position of piping with respect to the turbine housing. As the gear rotates it closes a switch and causes a motor-operated force to correct a part of the piping system. As the piping is rotated to its proper position the gear opens the switch deactivating the motor.

Sherburne's fourth device includes a pendulum attached to the horizontal portion of the piping. As the piping turns, the pendulum closes the switch causing a force to correct the position of the pipe.

When the piping has been properly positioned the pendulum arrangement swings to a neutral position opening the switch.

Sherburne's fifth device is similar to his first device except that the diameter of drums of the differential gear arrangement are proportioned to provide a different reference position of the piping for each temperature throughout a range of pipe temperatures. The first device used a single reference position.

12. Each of the structural elements of the combination described and claimed in the '753 patent was old in 1957.

Extracts from representative claims of Sherburne '753 are:

### "CLAIM 10

"Apparatus for controlling the position of at least a portion of fluid handling equipment subject to a change in position due to a change in a thermal condition of said equipment, said apparatus comprising

"means adapted to be operably connected to said portion and responsive to said change in thermal condition for applying to said portion external force to control movement of said portion to a desired position irrespective of the position change said portion would have had due to said thermal condition change without the application of said external force,

"energy valve means operably connected to said force applying means and adapted to be operably connected to a source of energy to control operation of said force applying means, and

"means operably connected to said energy valve means and responsive to said change in thermal condition to control said energy valve means,

"said energy valve control means comprising means for sensing a deviation in position of said portion from said desired position at said changed thermal condition and for controlling said energy valve means in response thereto to control the operation of said force applying means to force said portion to assume said desired position at said changed thermal condition,

"said energy valve control means thereby correlating said desired position of said portion with said changed thermal condition.

### "Claim 11

"Apparatus for controlling the orientation of at least a portion of fluid handling equipment subject to a change in orientation caused by a change in a thermal condition of said equipment, said apparatus comprising

"means adapted to be operably connected to said portion for applying to said portion external force to control movement of said portion to a desired orientation irrespective of the orientation change said portion would have had due to said thermal condition change without the application of said external force,

"energy valve means operably connected to said force applying means and adapted to be operably connected to a source of energy to control operation of said force applying means,

"means operably connected to said energy valve means and to said portion for sensing a deviation in orientation of said portion from said desired orientation at said thermal condition change and for controlling said energy valve means in response thereto to control the operation of said force applying means to force said portion to assume said desired orientation at said changed thermal condition.

### "CLAIM 12

"(An apparatus according to claim 11) "said sensing means being connected to spaced apart points on said portion to thereby sense said deviations in orientation of said portion from said desired orientation.

### "CLAIM 13

"(An apparatus according to claim 12) "said desired orientation being different than the orientation of said portion prior to said change in thermal condition.

## "CLAIM 16

"(An apparatus according to claim 11) "in which said force applying means comprises a motor driven jack.

## "CLAIM 17

"Apparatus for controlling the orientation of at least a portion of fluid handling equipment subject to a change in orientation due to a change in a thermal condition of said equipment, said apparatus comprising

"force applying means adapted to be operably connected to said portion and movable to restrict said portion against movement due to said change in thermal condition to any orientation substantially different from a desired orientation,·

"energy valve means operably connected to said restricting means and adapted to be operably connected to a source of energy to control movement of said restricting means and

"means operably connected to said energy valve means and to said portion for sensing a deviation in orientation of said portion from said desired orientation at said changed thermal condition and for controlling said energy valve means in response thereto to control the operation of said restricting means to force said portion to assume said desired orientation at said changed thermal condition."

13.  Sherburne's '045 is an improvement patent over the other two.  In both Loepsinger '886 and Sherburne '753 the jack acts as a fixed anchor when it is not in motion.  In the event of a power failure, the jack prohibits the pipe from moving thermally with possibly harmful effects.  Sherburne's '045 remedies this situation by using an hydraulic jack which can be automatically released whenever the motor is turned off.  This permits the jack to monitor the thermal movements of the pipe and to exert a force only when the pipe moves to an improper position.  The jack does not act as a fixed anchor in case of a power failure.

14.  Sherburne's '045 was issued with 17 claims.  Grinnell claims that 10 claims (1–7, 9, 11, and 12) are infringed.  Each of the structural elements of the combination claimed in Sherburne's '045 was old prior to 1960.  Sherburne selected a conventional hydraulic system from a catalog published by Oil-Dyne, Inc.  The sensing devices were well-known.

Extracts from representative claims of Sherburne '045 are:

## "CLAIM 1

"Apparatus for controlling the position of at least a portion of fluid handling equipment subject to a change in position due to a change in a thermal condition of said equipment, said apparatus comprising

"means adapted to be operably connected to said portion and responsive to said change in thermal condition for applying to said portion a force to control movement of said portion to a desired position irrespective of the position change said portion would have had due to said thermal condition change without the application of said force,

"energy valve means operably connected to said force applying means and adapted to be operably connected to a source of energy to control operation of said force applying means,

"means operably connected to said energy valve means and responsive to said change in thermal condition to control said energy valve means and to thereby correlate said desired position of said portion with said changed thermal condition, and

"means responsive to said portion's being moved to said desired position for at least partially releasing said force applying means,

"said energy valve being also controlled by movement of said portion from said desired position at said changed thermal condition due to said release of said force applying means to control said force applying means to reapply force to said portion to return said portion to said desired position.

## "CLAIM 2

"Apparatus for controlling the location which at least a fluid containing portion of a fluid handling system will occupy in response to a change in a thermal condition of the system, said apparatus comprising

"a force-exerting unit for exerting a force on said portion,

"means for driving said force exerting unit,

"energy valve means operably connected to said driving means and adapted to be operably connected to a source of energy to control operation of said unit,

"means operably connected to said energy valve means and responsive to said change in thermal condition to control said energy valve means to actuate said driving means and thereby force said portion to assume a desired location at said changed thermal condition and

"means responsive to deactuation of said driving means for releasing said force applied to said portion by said force exerting unit.

## "CLAIM 4

"A mechanism to control stresses in a fluid handling system due to a change in thermal condition of said system, said mechanism comprising

"a piston and cylinder unit,

"each having a connection point one for attachment to fixed structure and the other for attachment to said system,

"a reversible pump for pumping fluid to said unit to provide a pressure differential on opposite sides of said piston to move said piston and said cylinder with respect to each other to change the length of said unit between said connection points,

"a motor for actuating said pump,

"means (a) responsive to a change in said thermal condition of said system for actuating said motor to actuate said pump to change the length of said unit to a desired length at said changed thermal condition, (b) for deactuating said motor and said pump in response to achievement of said desired length and (c) responsive to a change in length of said unit from said desired length at said changed thermal condition to reactuate said motor and pump to return said unit to said desired length, and

"means for dissipating said pressure differential automatically in response to said deactuation.

## "CLAIM 5

"For a fluid handling system,

"a force applying device comprising first and second members each having a connection point thereon one for connection to fixed structure and the other for connection to said system, means for applying force to force one member to move with respect to the other to change the dimension between said points,

"means (a) responsive to a temperature change for actuating said forcing means to change said dimension to a desired dimension, (b) for automatically deactuating said forcing means when said desired dimension is achieved and (c) responsive to a change from said desired dimension by movement of said members when said force is released to again actuate said forcing means to move said one member to achieve said desired dimension and

"means for releasing said force in response to deactuating of said forcing means,

"said members being substantially free to move with respect to each other when said force is released,

## "CLAIM 7

"A mechanism according to claim 4

"in which a fluid conduit is connected between said pump and said cylinder on opposite sides of said piston,

"in which said dissipating means comprises bypass conduit means for bypassing said pump, and

"in which said bypass conduit means has valve means automatically respon-

sive to operation of said pump to close said bypass conduit means and automatically responsive to deactuation of said pump to open said bypass conduit means.

### "CLAIM 9

"A mechanism according to claim 7

"in which said piston and cylinder unit is connected to a piping system which expands and contracts when subjected to changes in temperature,

"in which said piston and cylinder unit when actuated applies force to a portion of said system,

"in which said means for actuating said motor comprises

(a) energy valve means operably connected to said motor and adapted to be operably connected to a source of energy

(b) and further comprises means operably connected to said energy valve means for controlling said energy valve means to actuate said motor in response to a change in thermal condition of said system to force said portion of said system to move to a desired location at said changed thermal condition irrespective of the movement which said portion would have due to said thermal condition change without said mechanism.

### "CLAIM 11

"A mechanism according to claim 7, "said valve means having means for normally biasing said valve means to open said bypass conduit when said pump is deactuated, said valve means being forced to move to close said bypass conduit means by operation of said pump and against the force of said biasing means.

### "CLAIM 12

"A mechanism according to claim 7, including a fluid reservoir in communication with said fluid conduit."

### III. *Background of the Patents in Suit*

15. On July 25, 1956, in response to an inquiry, Grinnell began to consider the design and development of a motor-operated pipe positioning device which would operate in response to a change in the temperature of the pipe. On August 1, 1956, Grinnell designed its first device, which was illustrated in a drawing prepared by Grinnell on August 22, 1956. In June 1957 a report was prepared at Grinnell summarizing the building and testing of the first motor-operated device. On February 3, 1958, Grinnell filed the first application for the Loepsinger patent.

16. Sherburne recognized there was a drawback to the Loepsinger temperature controls. Shortly after he began to consider the matter, he proposed a differential gear position sensitive control. He described this in a memorandum dated December 15, 1957, in which he said in part:

"I know that there is nothing new in a differential pulley switch arrangement as it has been used extensively as telemetering equipment and Venturi tube indication. I believe, however, that its use as a control device for our motor operated hanger would be worthy of further investigation."

This proposal formed the basis for Sherburne's '753 patent.

17. Grinnell learned, after it began to promote its motor-operated screw jack positioning unit, that the industry was concerned that in the event of power failure, an electrically operated device would become a rigid support which might damage the pipe. Within a short time after Sherburne began to consider this matter, he suggested that an hydraulic piston-cylinder arrangement of the unlocking type could be substituted for the motor-operated screw jack positioning unit. Such a device was described in the Oil-Dyne catalogs as early as 1958. Sherburne selected one of Oil-Dyne's standard units. His proposal to substitute the unit for the screw jack forms the basis for the '045 patent.

### IV. *Suozzo's Work*

18. Leonard Suozzo is the president and ninety per cent owner of the defendant Bergen. Suozzo engaged in considerable activity relating to the design of a

motor-operated pipe positioner prior to and contemporaneously with the work that led to the patents in suit. Suozzo's work was not published. Bergen recognizes that it is not a part of the prior art under 35 U.S.C. § 102. Bergen asserts, however, that Suozzo's work demonstrates that it was obvious to a skilled pipe support designer to combine well-known devices to sense and control the position of power plant piping. It is Bergen's position that the non-obvious subject matter of the patents is shown by Suozzo's work and that, consequently, the patents fail to survive the requirements of 35 U.S.C. § 103.

19. In 1952 Suozzo wrote to Genspring, Inc. With reference to Wood's motorized hanger he said:

"While I can see a probable application of this equipment in some distant future, perhaps made also to control position and movement, to overcome possible piping overstressing problems, such as experienced at the Public Service installations, our present financial position does not permit the expenditure on equipment not having immediate market."

The reference to a device to control position and movement to overcome pipe overstressing is so general and vague that it is not evidence of the obviousness of plaintiff's devices. Moreover, the letter was not published; its existence has not been corroborated. Loepsinger, Sherburne and employees of the plaintiff associated with them were not aware of the letter at the time they developed the devices which form the basis of the patents in suit.

20. On February 6, 1953, Suozzo prepared a drawing of a level position controlling device, which sensed an angular deviation of position of piping from a desired position and signaled a screw jack to correct the position. After this was done the screw jack became deactivated. He used a mercury switch device to control the motor.

21. On February 14, 1953, Suozzo prepared another drawing of a level posi-

tion controlling device, which utilized a pendulum in place of the mercury switch.

22. Suozzo had models of these devices made in March 1953. A test of the models with light bulbs indicated that they positioned the pipe.

23. On December 27, 1955, Suozzo prepared a drawing of a thermo position sense device. This successively activated switches as the temperature of the piping changed. As each successive switch was tripped a motor would be activated to cause a screw jack to raise or lower the piping a fixed amount. The drawing and the device show no follow-up of the corrective action taken by the screw jack.

24. On January 10, 1956, Suozzo prepared a drawing of a third variation of his position sensing device. Its function was to sense changes in position of two remote points of a piping system and to activate one or more screw jacks to control the position of those two points.

25. Suozzo had models of these devices constructed, and in March or April 1956 he tested them.

26. On January 18, 1956, Suozzo prepared a drawing of a motorized screw jack device, which contained a disc spring, or load cell device, when required. This was to be used with his sensing device.

27. On March 16, 1956, Suozzo wrote Wood at Genspring thanking him for his comments on Suozzo's drawing of the motorized hanger.

28. All of Suozzo's foregoing activities occurred prior to and independently of the plaintiff's work in July 1956 relating to automatically motor-operated pipe positioning devices.

29. On June 25, 1957, Suozzo prepared a drawing of a position sense device, which senses and follows a change in angular orientation of a section of pipe or equipment.

30. On May 18, 1960, he prepared a drawing of a motor-operated assist for a constant support hanger with a disconnecting link that, in the event of power failure, released the force applied to the piping by the assist. The release

feature was illustrated prior to Sherburne's work upon which the '045 patent in suit is based.

31. The court accepts the genuineness of Suozzo's letters, drawings and models.

32. None of Suozzo's work constituted a reduction to practice of the combinations in suit of a motorized jack with a control to correctly position high temperature piping. The drawings and models are crude and imperfect. They could not be used without refinement. Despite these deficiencies, the sketches and models show that the application of an old combination of controls and motorized jacks to correctly position high temperature piping was obvious to a person skilled in the art of designing high temperature piping.

33. Suozzo's two letters to Genspring are so vague that they do not demonstrate obviousness of the patents in suit.

34. Suozzo purposely suppressed and concealed his sketches and models. He intended to reveal them only when it was to his financial advantage to do so. He did not apply for patents until after he learned of the plaintiff's activities.

35. In Kendall v. Winsor, 62 U.S. (21 How.) 322, 328, 16 L.Ed. 165 (1859), the Court said:

"The true policy and ends of the patent laws enacted under this Government are disclosed in that article of the Constitution, the source of all these laws, viz: 'to promote the progress of science and the useful arts,' contemplating and necessarily implying their extension, and increasing adaptation to the uses of society. (Vide Constitution of the United States, art. I, § 8, clause 9.) By correct induction from these truths, it follows that the inventor who designedly, and with the view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public, comes not within the policy or objects of the Constitution or acts of Congress. He does not promote, and, if aided in his design, would impede, the progress of science and the useful arts. And with

a very bad grace could he appeal for favor or protection to that society which, if he had not injured, he certainly had neither benefitted nor intended to benefit. Hence, if, during such a concealment an invention similar to or identical with his own should be made and patented, or brought into use without a patent, the latter could not be inhibited nor restricted, upon proof of its identity with a machine previously invented and withheld and concealed by the inventor from the public. The rights and interests, whether of the public or of individuals, can never be made to yield to schemes of selfishness or cupidity; moreover, that which is once given to or is invested in the public cannot be recalled nor taken from them."

Harper v. Zimmermann, 41 F.2d 261, 267 (D., Delaware 1930), in considering unpublished drawings says:

"Private unpublished drawings may be mislaid or hidden so as to preclude all probability of the public ever deriving any benefit therefrom, and the policy and language of the law combine to forbid that that from which the public may derive no benefit shall serve to defeat a patent for which the public has received, as a consideration, full disclosure."

Title 35 U.S.C., Section 102, provides in part:

"A person shall be entitled to a patent unless—

\* \* \* \* \* \*

"(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it \* \* \* "

▇ The same reasons of public policy which forbid prior suppressed and concealed activities from invalidating a patent under 35 U.S.C. § 102(g) are also applicable to 35 U.S.C. § 103.

▇ Section 102(g) is designed to implement the primary purpose of the patent laws by inducing prompt disclosures of discovery and discouraging con-

cealment. If the same acts of concealment were permitted to invalidate a patent under § 103, the constitutional basis of a grant of a patent monopoly would be subverted. Concealment would be encouraged and the intent of Congress to encourage disclosure would be set at nought.

The defendant relies upon Servo Corp. of America v. General Electric Co., 337 F.2d 716 (4th Cir. 1964), cert. denied 383 U.S. 934, 86 S.Ct. 1061, 15 L.Ed.2d 851, and Felburn v. New York Central R.R. Co., 350 F.2d 416 (6th Cir. 1965), to support its position that unpublished work may be used to show that the subject matter of the patent is obvious. These cases, however, do not teach that Suozzo's work should be considered on the issue of obviousness. Suozzo concealed his drawings and models. In *Servo* and *Felburn* the prior work did not receive the degree of publicity necessary to constitute prior art. But it was not concealed; on the contrary it was widely circulated.

■■ The court holds that no weight should be given to Suozzo's work on the issue of obviousness under 35 U.S.C. § 103. This evidence is inadmissible.

■■ 36. Suozzo's work and letters were not corroborated. For this reason they cannot be given probative force. Tidewater Patent Development Co. v. Gillette Co., 273 F.2d 936, 940 (4th Cir. 1959); 1 Rivise & Caesar, Interference Law and Practice (1940) 380.

## V. *Validity*

37. Validity of the patents depends upon 35 U.S.C. § 103 which provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be nega-

tived by the manner in which the invention was made. July 19, 1952, c. 950, § 1, 66 Stat. 798."

■■ At the outset the court observes that the question of obviousness cannot be decided on the basis of subjective speculation. Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670, 675 (4th Cir. 1961). Testimony of witnesses that the subject matter of the patent as a whole would or would not have been obvious to them must be received with care lest subjective opinion will supplant objective criteria. Cf. Marvel Specialty Co. v. Bell Hosiery Mills, Inc., 330 F.2d 164, 171 (4th Cir. 1964), cert. denied 379 U.S. 899, 85 S.Ct. 187, 13 L.Ed.2d 175 (1964).

Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966) prescribes an objective test:

"Under § 103, the scope and content of the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such *secondary* considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." (Italics added.)

A. The first factual inquiry concerns the scope and content of the prior art.

38. In 1941, U.S. Patent 2,248,730 issued to J. K. Wood. Wood describes the use of a motor-operated device, including a jack, to exert a force on and to support power plant piping. Wood's device detects the magnitude and direction of a change in position of piping and automatically causes the motor-operated screw jack to exert a constant force on the piping. The Wood patent acts in a manner similar to a constant support spring hanger. The jack follows the thermal movement of the piping to exert a constant supporting force. If

the pipe moves to an incorrect position in response to a change in temperature, the jack follows the pipe to its incorrect position. It does not prevent the pipe from going to an incorrect position as do the patents in suit. Wood was cited by the Patent Office in Loepsinger '886 and Sherburne '753 proceedings.

39. The Patent Office also considered Ray's 2,572,386, which describes a temperature response actuator for controlling the position of a valve.

40. In the prosecution of the Sherburne '045 the Patent Office cited Rankin 1,836,813 and McLeod 2,679,727. Each describes an hydraulic and patented cylinder actuator. In the Rankin construction the actuator releases automatically and in McLeod the actuator is automatically released in one direction when the motor is shut off. The patent was granted over these references on the basis of the argument that these patents do not relate to control of stresses in a high temperature fluid handling system.

41. Dewey's 1950 patent No. 2,501,994 was not considered by the Patent Office during the prosecution of the applications for the patents in suit. Dewey controlled the pitch of a fan blade and other members mounted for feathering movement upon a rotatable shaft. He used a motor-operated rack and pinion activated by a temperature sensitive switch, which follows the movement of and detects any error in the position of the rack and pinion over a range of temperatures. Dewey's patent is suitable for controlling the position of an object. Dewey did not suggest the use of his device to control high temperature piping. The combination of elements Dewey used is substantially similar to the combination of the old elements Loepsinger used in his patent.

42. LaJoy, Industrial Automatic Controls, Prentice-Hall, Inc., (1954), pp. 170, 175–177, shows that it was old to use a Wheatstone bridge as an error detector in a servomechanism used to control the position of an object. This publication was not considered by the Patent Office.

43. Lauer Lesnick and Matson, Servomechanism Fundamentals, McGraw-Hill (1947), pp. 20–22, shows that it was old to employ a differential gear arrangement as the error detector in a servomechanism used to control the position of an object. This publication was not considered by the Patent Office.

44. Sherburne's differential pulley switch arrangement was old.

45. Sherburne '045 patent substituted an hydraulic piston cylinder which can be automatically released whenever the motor is turned off for Loepsinger's screw jack. The hydraulic piston cylinder arrangement with the force release feature was described in the 1958 Oil-Dyne catalog. It is an old, commercially available device used by Sherburne to perform in the manner described in the catalog. The catalog, however, does not suggest its use to control the position of high temperature piping. The catalog was not considered by the Patent Office.

46. The 1952 Proceedings of the National Conference on Industrial Hydraulics contains a paper by C. W. Lincoln, "Hydraulic Steering in General Motors Cars." This shows that it was old to use an hydraulic device in a control system in such a manner that the piston can float freely and exert no force under prescribed conditions. This publication was not considered by the Patent Office. One of Grinnell's engineers attended this conference.

47. The first Loepsinger application, filed February 3, 1958, is prior art with respect to Sherburne's patents '753 and '045, within the meaning of 35 U.S.C. § 103. Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965).

B. The second factual inquiry concerns the differences between the prior art and the claims at issue.

48. The primary difference between Wood's patented motor-operated pipe support and the patents in suit lies in the operation of the devices. Wood's support follows the movement of the piping to exert a constant supporting

force. The patents in suit do not follow the movement of the piping. They correctly position the piping according to the design of the piping system.

49. Grinnell sold the prior art Wood device as a constant support under the trade name, "Stress-Trol." Grinnell also sold its patented positioner under the the same name, "Stress-Trol." The construction of these two devices is similar. The controls differ. The devices are readily interchangeable. Twenty or thirty of the patented positioner type Stress-Trols were converted in the field to the Wood prior art constant support type. The change was relatively simple. The patented positioner device consists of the motor-operated screw jack with a sensing unit. The switches on the load cell are normally closed. Thus, to effect the change in the field from the positioner type to the constant support type, the sensing device was removed and the switches were changed from normally closed to normally open.

50. The principal difference between the 1950 Dewey No. 2,501,994, and the patents in suit is the object controlled. Dewey controlled fan blades, including fans used in the cooling towers of some power plants. The Dewey device consists of the same structural elements as Loepsinger's elements. Dewey's elements are similar to Loepsinger's in function, construction and interrelationship. They are similar in operation and the results achieved, with the exception that Dewey operated upon the position of fan blades and Loepsinger operated upon the position of high temperature piping. The devices are interchangeable. Dewey's device could be adapted to control the position of power plant piping with relation to the temperature of the pipe.

51. Sherburne's '753 patent differs from Loepsinger's only with respect to the differential sensing device. Loepsinger's is a temperature-position correlator. It senses an error in the position of the pipe with respect to the temperature of the pipe and follows the corrective action of the force-exerting device. On the other hand, Sherburne's differential sensing device senses direct-ly an error in the position of the pipe with respect to the desired position and follows the corrective action of the force-exerting device. Sherburne's principal differential sensing device is an old differential pulley arrangement. Sherburne's '753 not only senses and corrects for deviations in temperature, it also senses and corrects for deviations of the piping from its correct position due to causes such as shock, deflection of the building structure or distortion of the jack.

52. Sherburne's '045 patent differs from Loepsinger's and the '753 patent in the force-exerting device. Sherburne, in '045, used a commercially available motor-operated hydraulic system described in the Oil-Dyne 1958 catalog. This is an unlocking device designed to release force when the electric power is interrupted. The release feature of the hydraulic system was not new. It was used for power steering of an automobile. It was commercially available. When scepticism concerning the Loepsinger device came to Sherburne's attention, it was a simple matter to substitute a releasable hydraulic device for Loepsinger's screw jack.

53. Wood's 1941 patent, No. 2,248,730 also taught the substitution of an hydraulic jack for a screw jack. Neither of Wood's jacks, however, needed an interruptible feature.

C. The third criterion suggested by the Court in *Graham* is the level of ordinary skill in the pertinent art.

54. Here the pertinent artisans are those having ordinary skill in the design and installation of high temperature piping and its supports. The testimony of witnesses that the subject matter of the patents was, or was not, obvious to them or to other persons whom they knew is not conclusive evidence of the ordinary skill in the pertinent art. This is subjective opinion colored by hindsight and must be viewed with caution.

55. Objective evidence shows that persons skilled in the art were familiar with rigid supports, anchors, restraints, variable support springs, constant sup-

port springs and Wood's motorized support. These were used daily. Persons skilled in the art, such as Grinnell's designers and Bergen's chief engineer, were also familiar with servomechanisms and the basic controls used to operate them. No one, however, thought to install motorized jacks with appropriate controls to position high temperature piping over a temperature range prior to Grinnell. But the level of skill is demonstrated by the fact that within but a short time after an oil company posed the problem to Grinnell, it developed a controlled device to position pipe.

D. Among the secondary considerations mentioned by the Court in *Graham* are commercial success, long felt but unsolved needs and the failure of others.

56. There was no history of a long felt but unsolved need, or the failure of others to solve the problem. In fact Grinnell itself did not address itself to the problem until it received the request from an oil company in 1956.

57. The industry had learned to live with the problem of undesirable, erroneous pipe movement. Generally corrections were made by deliberate over-support or deliberate under-support of the pipe.

58. Grinnell's patents insure that the stresses in the piping system will not exceed maximum allowable limits due to errors in projected pipe movement. They also permit the use of shorter, more economic piping configurations. They can prevent harmful pipe movement due to vibrations and shock. Engineering consultants and pipe designers, including those employed by Bergen, have recognized the advantages of the combinations described in the patent. Nevertheless use of Grinnell's inventions in the industry has been limited. This is due in part to the caution exercised by pipe designers in embracing new devices. It is also due in part to the satisfactory performance of cheaper and less complicated pipe supports.

59. At the time of the trial, 8½ years after the introduction of Grinnell's motor-operated pipe positioners, Grinnell had orders for only 35 of the patented devices. During the same period Grinnell sold about 125 motor-operated constant supports, which were patterned after the 1941 patent issued to Wood. Among these 125 devices were 20 or 30 which in the field had been converted from the patented type to the Wood prior art constant support type.

## VI. *Conclusions of Law*

60. The presumption of validity created by 35 U.S.C. § 282 is weakened because the Patent Office did not cite or consider the 1950 Dewey patent No. 2,501,994; Heyl & Patterson, Inc. v. McDowell Co., Inc., 317 F.2d 719, 722 (4th Cir. 1963).

61. Each patent in suit is invalid in its entirety on the ground that any differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole was obvious at the time that the alleged inventions were made to a person having ordinary skill in the art. 35 U.S.C. § 103.

The patents in suit are combination patents. Validity of a patent combining old elements "depends upon whether these elements have been put together in such a manner, not obvious to a person skilled in the art, as to produce a new and better result. * * *" O. M.I. Corp. of America v. Kelsh Instrument Company, 279 F.2d 579, 582 (4th Cir. 1960).

The chief difficulty with Grinnell's case is that Loepsinger's '886 patent is not a new combination of old elements. Not only are the elements old, but also the combination itself is old. The combination is a known servomechanism. The manner in which the elements were put together was obvious to a person skilled in the art. Similar elements combined in a similar way appeared in Dewey's 1950 patent No. 2,501,-994. The accumulation of the old devices lacks patentability because the whole does not exceed the sum of its parts. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340

U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

■ 62. Grinnell contends, however, that the pipe itself is an element, which combined with the old elements provides new and better results. Stated conversely, it is Grinnell's contention that until the elements were combined with the piping, there was no anticipation and the subject matter as a whole was not obvious.

Grinnell's position is of more than passing importance. Its acceptance would withdraw old, well-known servomechanisms from the market whenever they were applied to new uses in the manner in which they were intended to be applied.

Grinnell's contention previously has been rejected. The piping is not an element of the combination. It is the object to which the combination is applied. In Fluor Corporation v. Gulf Interstate Gas Company, 259 F.2d 405 (5th Cir. 1958), an acoustic filter was applied to a gas compressor to eliminate pulsations. The patentee contended the compressor was an element of the combination patent. The court held that the compressor was the source of the pulsations, causing the trouble intended to be corrected by the device. The acoustic filter was old; the patent was invalid.

Here the high temperature piping is not an element of the combination. The pipe's thermal expansion is the source of the stress at the boiler and generator which must be corrected.

■ 63. Grinnell's contention that the piping is an element of the combination suffers from another flaw. The piping is not claimed as an element. Claim 1 of the Loepsinger patent is typical. The preamble to the claim speaks of an apparatus for controlling the position of fluid handling equipment (high temperature piping) subject to a change in position due to a change in thermal condition of the equipment; the preamble concludes, "said apparatus comprising". The claim then describes three elements comprising the apparatus, none of which is the piping. The elements are: First, a means to exert a force (the motor driven screw jack or hydraulic piston); second, an energy valve means (a switch to turn the motor off and on; and third, a means operably connected to the energy valve means and responsive to thermal condition to control the energy valve means (a sensing device or error detector).

■ From the claims it is clear that the piping is the object to be controlled and not an element of the combination. Grinnell urges that the entirety of the claimed description of the combinations sought to be patented, including the recitations of the preamble must be considered in determining the patentability of the combination. Under the circumstances of this case, the contention is without merit. It is quite apparent that the preamble of the claim must be read to give meaning to the claim. It does not follow, however, that the preamble can be used to expand the claim by adding another element to the claimed elements. A preamble which must be read to give meaning to the claim constitutes a limitation upon the claim. Marston v. J. C. Penney Company, 353 F.2d 976, 986 (4th Cir. 1965), cert. denied 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966). The preamble, however, cannot expand the claim. Ford Motor Co. v. Parks & Bohne, Inc., 21 F.2d 943, 946 (8th Cir. 1927).

Loepsinger's '886 patent is invalid under 35 U.S.C. § 103.

64. The substitution of sensing devices in Sherburne's '753 patent for Loepsinger's sensing device and the substitution of the releasable hydraulic force exerting system in Sherburne's '045 patent did not introduce new elements to the combinations shown in Dewey and Loepsinger. The '753 and '045 combinations did not produce new results. The substitutions were obvious to a person having ordinary skill in the art. These patents are invalid under 35 U.S.C. § 103.

VII. *Supplemental Findings and Conclusions*

The court recognizes that this case is not free from difficulty, and for that reason will make supplemental findings and conclusions on the other issues tendered to it.

A. *Overclaiming*

65. The combination claims of Sherburne's patents '753 and '045 are also invalid on the ground that they are too broad. These patents claim the entire combination found in Loepsinger's '886, although admittedly each improves only one element. In the '753 patent this element is the sensing device; in the '045 patent the element is the force exerting device. The mere improvement of one element of a combination does not permit patenting the whole. Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008 (1938); Heyl & Patterson, Inc. v. McDowell Co., Inc., 317 F.2d 719, 723 (4th Cir. 1963). Overclaiming usually extends the length of the monopoly. Here it does not. But the fact that the patents all issued upon the same day and that Sherburne does not seek to extend the length of the monopoly affords no defense to the overclaiming. The vice of Sherburne's overclaiming lies in the extension of Sherburne's monopoly to the unpatentable combination found in Loepsinger's '886 patent.

On the other hand, if Loepsinger's patent is valid, no extension of the subject matter or length of the monopoly is caused by the overclaiming. Under these circumstances Sherburne's '753 and '045 patents would not be invalidated by overclaiming. Cf. J. R. Clark Co. v. Jones & Laughlin Steel Corp., 288 F.2d 279, 281 (7th Cir. 1961). Their validity would depend only on the application of 35 U.S.C. § 103.

B. *Infringement*

66. Each of the accused devices consists of a constant support spring in association with a motor-operated hydraulic assist unit controlled by a sensing device. The motor-operated hydraulic assist unit, only when acti-vated, acts on the piping support to help position the piping should the piping not move to a desired position as its temperature changes. The accused sensing device detects the magnitude and direction of an error in the calculated relationship at a given temperature between (a) the thermal expansion of a supported diagonal offset in a vertical riser in a pipe line, and (b) the elevation of the upper end of the offset. After the error has been detected the sensing device activates the motor-operated hydraulic assist unit.

The only significant difference between the patented devices and the accused device is the sensing unit. The accused sensing device includes a pair of parallel bars which slide with respect to each other. The relative position of the slide bars reflects, by means of cables, pulleys, and a lever, the relationship between the thermal expansion of the offset and the elevation of the upper end of the offset. The relative position of the slide bars reflects any error both in magnitude and direction. One slide bar carries switches, the second slide bar has cammed surfaces which activate the appropriate switch in the event that the relative position of the slide bar changes sufficiently in one direction or another.

None of the patents in suit specifies Bergen's slide bar sensing device. Therefore, the principal question is whether the accused device is an equivalent of any of the sensing devices claimed in the patents. The range of equivalents to which Grinnell's means claims are entitled is directly related to the magnitude of the departure of the claimed invention over the prior art.

Bergen urges that the claims in suit represent a narrow advance over the prior art and the range of equivalents is correspondingly narrow, virtually restricted to the constructions described in the patent's specifications. But Bergen's contention overlooks the conclusion that if the piping is considered an element of the claims (and not simply the object upon which the combination operates), the advance over the prior art is broader than the combination of the

three elements composing the servo-mechanism. Under these circumstances the specifications should not be considered the limit of the claims. See Brown v. Brock, 240 F.2d 723, 728 (4th Cir. 1957); Marvel Specialty Company v. Bell Hosiery Mills, Inc., 330 F.2d 164, 175 (4th Cir. 1964), cert. denied 379 U.S. 899, 85 S.Ct. 187, 13 L.Ed.2d 175 (1964).

67. The accused sensing device is an equivalent of the sensing devices claimed in the patents. In Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929), the Court, in discussing equivalents, said:

" * * * generally speaking, one device is an infringement of another 'if it performs substantially the same function in substantially the same way to obtain the same result. * * * Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.' "

68. Every element of each of the claims in issue of each patent in suit, or its equivalent, is found in each of the accused installations. Each of the accused devices performs substantially the same functions in substantially the same ways and accomplishes the same result as the combination of the claims in issue of each of the patents in suit. If the patents were valid, the accused devices would infringe the patents. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Marston v. J. C. Penney Company, 353 F.2d 976, 985 (4th Cir. 1965), cert. denied, 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966); Marvel Specialty Company v. Bell Hosiery Mills, Inc., 330 F.2d 164, 175 (4th Cir. 1964), cert. denied, 379 U.S. 899, 85 S.Ct. 187, 13 L.Ed.2d 175 (1964).

69. The accused devices were installed upon the two main steam and two hot reheat lines at Unit No. 5 of the Chesterfield Station of defendant, Virginia Electric & Power Company, by defendant, Stone & Webster Engineering Corporation, with the aid of the various Bergen Corporations, after issuance of the patents in suit. The jacks and controls were supplied by Bergen and Bergen participated in starting up the installations. Virginia Electric & Power Company has used these installations since they were completed.

VIII. *Relief*

70. The complaint should be dismissed and judgment entered for the defendants on the counterclaim.

71. The plaintiff, its officers and agents, and those in privity with it, and each of them should be enjoined and restrained from harassing with threats of infringement, and from instituting any suits for infringement against, defendants, or anyone in privity with the defendants, including their suppliers and customers under any of the patents in suit.

72. The defendants should be awarded costs.